IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GEORGE HURON JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-12-541 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION,[1] | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary

Judgment (Document No. 10), Defendant's Motion for Summary Judgment (Document No.11) and

Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 13). After

considering the cross motions for summary judgment, the administrative record, and the applicable

law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for

Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for Summary Judgment

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for Michael J. Astrue as the defendant in this action.

[2] The parties consented to proceed before the undersigned Magistrate Judge on August 6, 2012. (Document No. 8).

(Document No. 10) is DENIED, and the decision of the Commissioner is AFFIRMED.

## I.  Introduction

Plaintiff, George Huron, Jr., ("Huron") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability benefits. Huron argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Gary J. Suttles, committed errors of law when he found that Huron was not disabled. Huron argues that he has been disabled since January 1, 2003, due to post traumatic stress disorder ("PTSD"), back problems and back pain. According to Huron, the ALJ failed to consider all the evidence concerning his impairments and as a consequence his decision is not supported by substantial evidence. He further argues that the hypothetical question the ALJ posed to the Vocational Expert failed to include all of Huron's limitations, namely his non-exertional limitations related to PTSD.  Huron seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding his claim for further consideration. In addition, Huron requests that should the matter be remanded that it be assigned to a different ALJ. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Huron was not disabled, that the decision comports with applicable law, and that the decision  should, therefore, be affirmed.

## II.  Administrative Proceedings

On October 17, 2009, Huron filed for disability insurance benefits claiming he has been disabled since January 1, 2003. (Tr. 134-137). The Social Security Administration denied his application at the initial and reconsideration stages.  (Tr. 98-110). Huron then requested a hearing before an ALJ.  (Tr. 111-113).  The Social Security Administration granted his request, and the ALJ

held a hearing on July 16, 2010.  (Tr. 41-97). On August 20, 2010, the ALJ issued his decision finding Huron not disabled. (Tr. 24-40).  In his decision, the ALJ found that Huron was not disabled at any time from January 1, 2003, through the date Huron was last insured, which the ALJ deemed was December 31, 2008.

Huron sought review by the Appeals Council of the ALJ's adverse decision.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. The Appeals Council, on December 15, 2011, concluded that there was no basis upon which to grant Huron's request for review citing in part that Huron failed to provide additional comments or evidence.  (Tr. 7-14). Because Huron had provided additional medical records (Tr. 623-637), and had corresponded with the Appeals Council about the medical records, the Appeals Council vacated its Action. Thereafter, the Appeals Council amended the ALJ's decision to reflect that Huron was last insured through September 30, 2010, and in all other respects affirmed the ALJ's decision. (Tr.10-12).  Huron has timely filed his appeal of the ALJ's decision.  The Commissioner has filed a Motion for Summary Judgment (Document No. 11).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 10), to which Defendant has filed a Response.  (Document No. 13).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 637.  (Document No. 3).  There is no dispute as to the facts contained therein.

3

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision.  *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).   The evidence must create more than "a

suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C.  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

5

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his August 20, 2010, decision, that Huron was not disabled because he had the RFC to perform light work subject to certain restrictions. In particular, the ALJ determined that Huron had not engaged in substantial gainful activity since January 1, 2003 (step one); that Huron's back disorder (discogenic and degenerative), depression and PTSD were severe impairments (step two); that Huron did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); based on the medical records, and the testimony of Huron, Huron had the

RFC to perform light work subject to certain restrictions. In particular, Huron could "occasionally [lift] 20 pounds and frequently [lift] 10 pounds. He can sit, stand, and walk six of eight hours each for a full eight hour day. His push/pull and gross/fine dexterity is unlimited. He can occasionally climb stairs and ladders but no ropes, scaffolds or running. He can bend, stoop, crouch, crawl, balance, twist and squat. He gets along with others, understands detailed instructions, concentrates and performs detailed tasks and responds and adapts to workplace changes and supervision." (Tr. 32). The ALJ found that Huron could not perform his past relevant work (step four). The ALJ further found that based on Huron's RFC, his age, education and work skills acquired from his past relevant work, and the testimony of a vocational expert, that Huron could perform work as a construction labor supervisor, a construction labor expediter, and a hardware sales clerk and was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The objective medical evidence shows that Huron has been treated for various impairments including but not limited to his back, emotional problems, prostate problems, hearing loss and acne. Huron served in the United States military in Vietnam. Some of his health records are from the Veterans Administration, and others are from outside health providers.

By way of background information, Huron injured his back in 1997.[3]  The objective medical evidence shows that Huron has been treated for back problems and back pain as well as for depression and PTSD. The medical records show that Huron injured his back in 1997.

With respect to Huron's back injury, Huron testified that he injured his back in a work-related accident in 1997. (Tr. 58). Because the injury occurred in the scope of his employment, worker's compensation was involved. Huron reached maximum medical improvement for purposes of worker's compensation in November 1998. (Tr. 213-217).   Even though Huron was released to work, he continued to have problems with his lower back and related to this, back pain. He was evaluated on September 16, 2004, by Robert L. Brownhill, M.D., specializing in general orthopaedics. Dr. Brownhill summarized Huron's treatment since his initial injury on April 7, 1997, to the date of his exam of Huron's lower back on September 16, 2004, as follows:

> Apparently while working on the 7th of April 1997, he was lifting or moving a heavy compressor. He was working for a drywall company at the time. He twisted his back and experienced low back pain. I have limited medical records, the first being in December from Dr. Morrow, indicating traction and manipulation. He was referred to Dr. Bernstein for medication. The next record is from Dr. Morrow again, 8-14-03, manipulated cervical, thoracic and lumbar spine. October of 2003 – 15 minutes of traction, manipulation. It is noted that the effects of the steroid injections had worn off. The x-rays provided by the patient indicated that he had had epidural steroid injections on 5-29-03, 6-12-03 and 6-26-03, which gave him good temporary relief.
>
> In November of 2003, noted severe low back pain, numbness, recommended he be referred to an orthopedic surgeon. The last note I have is from Dr. Morrow, noted manipulation, pain in both legs, worried about his claim. At any rate, apparently he was also seen by Dr. Rodriguez. According to his history, he was told by Dr.

---

[3] The ALJ's decision contains conflicting dates for when Huron injured his back, April 2007 and 1997. (Tr. 30 & 33).  The correct date is 1997. To the extent that Huron relies on the ALJ's misstatement as a ground for reversal of the ALJ's decision, he is not entitled to relief on this ground because any error was harmless. *See May v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)(procedural perfection is not required). The medical records summarized by the ALJ show the date of injury as 1997 and this was corroborated by Huron's testimony.

Rodriguez that he would probably need surgery and he recommended a diskogram be done. Dr. Rodriguez's records are not available.

He denied any previous injuries, said he has been in good health, with no significant problems. He does apparently have an enlarged prostate which is being treated at the VA. Beyond that he has no other medical problems.

Physical Examination: The patient sits on the table without difficulty. Straight leg raising in the sitting position is negative at 90 degrees. The neurologic examination of the lower extremities reveals hypoactive Achilles reflexes bilaterally. Patellar reflexes are present and equal. In the recumbent position he complains of pain in the back of the leg at about 90 degrees straight leg raising on the right with definite tight hamstring, also buttocks pain. On the left he complains of pain in the low back as well as the left leg at about 70 degrees of straight leg raising. Likewise, with the knee acutely flexed on the left side he complains of pain in the back.

Pelvic rocking caused him to complain of some mild back pain. There is tenderness to palpation in the lower lumbar area, progressively increasing toward the lower end of the lumbar spine. There is also some pain over the right sacroiliac region and right buttock. He is able to walk on his heels and toes without difficulty, bends forward reversing his curve well with his hands about six inches above the floor, resuming the upright position without difficulty. The remainder of the examination is unremarkable. An original MRI done on 3-18-98 (by Dr. Morrow, D.C) is reported to have revealed left L4-5 and herniation to the left at L5-S1 with S1 root involved. This information in a report dated 4-9-04 by Dr. O'Kelly, D.C. There was a rebuttal by Dr. Morrow on 5-4-04, and reported these MRI findings. Dr. Morrow also noted on his first visit on 3-10-98 that patient had obvious signs of nerve root irritation, intervertebral disc syndrome on the left side, from his physical examination.

An additional MRI apparently was done on 7-26-02 and was read as a 3-4 mm broad-based posterior protrusion which mildly indented the sac at L3-4, superimposed 4-5 mm far left posterolateral herniation, enhancing annular tear which effaces the emanating left L3 nerve root sleeve. At the L4-5 level there was a 3 to 4 mm broad-based posterior protrusion which mildly indented the sac. At L5-1 there was a 4 mm broad-based annular tear which mildly effaces the S1 root sleeve. There is moderate bilateral foraminal narrowing. This was read by Dr. Cain and Dr. Cain apparently also did the epidural steroid injections, according to the additional records provided.

It is my impression this patient does have clinical evidence of persistent radiculopathy on the left side. I think there is a significant diskogenic component to his pain and therefore I would recommend that he have a diskogram to evaluate the disc as the source of the pain, and then he would require the appropriate treatment which may include surgical intervention and fusion at the affected level, which would

be most likely L5-S1 but both 3-4 and 4-5 should be evaluated. (TR. 210-211).

Around this same time, the medical records show that Huron was referred by Dr. Morrow to Dr. Jose E. Rodriguez for an evaluation. The evaluation took place on August 17, 2004. (Tr. 607-608). Huron reported that since 1997 he had been experiencing low back pain radiating through his left lower extremity.  In connection with this evaluation, Dr. Rodriguez reviewed the results of x-rays taken in 1998 and the results of a July 26, 2002, MRI. He also examined Huron.  Dr. Rodriguez noted that Huron had a normal gait and could heel and toe walk. He also noted that Huron's range of motion was restricted. Huron's straight leg raise test was negative on the right and positive on the left.  Dr. Rodriguez opined that Huron had lumbar radicular syndrome with obvious S1 nerve root deficits on the left and a herniated disc at L5-S1 with discogenic pain syndrome. As to future treatment, he opined that Huron would "benefit from further work-up. I will advise a lumbar discogram with a follow-up CT, L3-4, L4-5 and L5-S1. I will see him back when the aforementioned gets done." Dr. Rodriguez wrote a letter  to Dr. Morrow indicating Huron had a surgical condition but without additional testing could not elaborate on what type of surgery Huron required.  Notwithstanding his opinion that Huron would benefit from further work-up, because Huron was clinically stable, Dr. Rodriguez released Huron to work.

In October 2007, Huron was examined at the VA. (Tr. 448-453). According to the exam note, he had a full range of motion in his upper and lower extremities, his strength and resistance in his upper and lower extremities were normal, he had a negative straight leg raise test, and no spine tenderness. (Tr. 452). X-rays of the spine taken on October 16, 2007, showed mild degenerative changes to sacroiliac joints bilaterally.  Huron was next seen at the VA on June 10, 2008, for back pain. The treatment note indicates that Huron expressed his desire to be treated by his private

chiropractor, Dr. Morrow, and not at the VA. The treatment note further reveals that Huron had a full active range of motion of his upper and lower extremities. His strength was 5/5 in upper and lower extremities. He had a positive straight leg raise test at 20 degrees on the left and at 40 degrees on the right. He was diagnosed with "lower back pain with bilateral radiculpathy, chronic. (Tr. 423-425). The most current radiologic imaging in the medical records is a MRI that was taken on July 6, 2008. (Tr. 226-228, 275-276). The MRI showed multilevel degenerative changes and marked facet arthrosis in the lumbar spine from L3 to S1 but worst at the L4-5 level. The report states:

> The lumbar spine alignment is normal. The bone marrow signal is unremarkable and there is no bony lesion. The visualized paravertebral soft tissues are within normal limits. The visualized lower lumbar spinal cord, conus, and cauda equina are unremarkable.
>
> There are multilevel degenerative changes in the lumbar spinal vertebrae and discs consistent with posterior disc bulges, anterior osteophyte formation, facet joint hypertrophy, and ligamentous hypertrophy. These changes are causing varying degrees of lumbar spinal canal stenosis and foraminal narrowing described below.
>
> L3/L4 level: Diffuse disc bulge and marked facet arthropathy. Mild spinal stenosis. No foraminal stenosis.
>
> L4/L5 level: Diffuse disc bulge and marked facet arthropathy. Moderate to severe spinal stenosis. The right lateral recess is narrowed. The left appears patent. No foraminal stenosis.
>
> L5/S1 level: Diffuse disc bulge and marked facet arthropathy. No spinal stenosis. Moderate bilateral foraminal stenosis. Remaining lumbar spine levels are unremarkable.

On November 26, 2008, Huron underwent a consultative examination  with Dr. Bruce Ehni, a neurosurgeon. (Tr. 279-281, 406-408). Huron had a negative straight leg raising test. He had a full range of motion in his lumbar spine.  (Tr. 408).  Huron reported pain relief by changing position and by taking Aleve.  Dr. Ehni reviewed the July 6, 2008, MRI results and opined that the MRI showed

"negligible changes. Normal for age. There are no changes that reach surgical significance, no root compression." (Tr. 280, 406).  With respect to treatment, Dr. Ehni opined: "no surgical intervention, will send for pain management. The effect of smoking on the disease process was discussed with him, smoking cessation encouraged. Back surgery under this circumstance does not benefit musculoskeletal back pain given the absence of more specific findings."  (Tr. 280, 406). Pursuant to Dr. Enhi's recommendation, Huron was referred for a pain consultation and physical therapy. He underwent a pain consult evaluation on January 16, 2009. (Tr. 269-274). The evaluator noted that Huron exhibited pain on palpation over the lumbar facet joints. Also, his range of motion was limited due to pain. He had a negative straight leg raise test. (*Id*.)  He had his physical therapy evaluation on April 21, 2009.  Huron had positive straight leg raising tests. The physical therapist wrote: "chronic [low back pain.] [Patient] with poor posture flexibility and body mechanics. [Patient] with no radicular symptoms and intact motor/sensory. [Patient's] pain aggravated by any loading movement such as extension." (Tr. 262, 367-369).   Huron had a follow-up with his primary care physician a few days later, on April 23, 2009.  (Tr. 363-365). According to the treatment note, Huron's range of motion was full in his upper and lower extremities, his strength was 5/5, he had a negative straight leg raise test, no spine tenderness was noted, he was neurologically intact and his gait was normal. Huron again expressed his desire for chiropractic services over that of treatment at the VA.  (*Id*.) At Huron's May 7, 2009, physical therapy session he reported his pain had been reduced. The therapist noted that Huron had increased flexibility. (Tr. 257, 361-362).  He was discharged from physical therapy the following week on May 13, 2009. (Tr. 360-361). The final physical therapy notes shows that Huron tolerated physical therapy well and he had expressed pain reduction. (*Id*.).

Also included in the medical records is a letter written by another chiropractor, Dr. Thomas

Hallisey, practicing at the East Loop Chiropractic Clinic in Houston, Texas. Dr. Hallisey identified himself as having treated Huron on a monthly basis for the past two years but provides no specifics about the nature of treatment or the dates of treatment. The letter is not dated. With respect to Huron's functional limitations, Dr. Hallisey writes: "in my professional opinion, I do not feel he will ever improve to go back to work in a normal work force."   (Tr. 612).

In addition, related to Huron's allegation that he is impaired due to his back, is a letter opinion dated July 12, 2010, by William R. Francis, M.D., an examining consulting physician.  (Tr. 613). According to the letter, Dr. Francis, relying on the July 2008 MRI results,  reviewed Huron's case with him in October 2009.  Clinically, Dr. Francis wrote that Huron had a restricted range of motion in his back. Dr. Francis opined that Huron was a candidate for surgery. He recommended that Huron undergo a decompression at L4-L5, partially L5-S1, and a lumbar fusion from L3 to the sacrum for stabilization." (Tr. 612). Dr. Francis further opined that in his professional opinion Huron could not work. He wrote: "[h]e is for all intentional purposes, given the type of work he has been doing, physically disabled at this time." (Tr. 612).

Finally, Clark McKeever, M.D., completed a "Residual Functional Capacity Assessment" on September 21, 2010, based on his two-year treating relationship with Huron from January 1, 2006 to January 31, 2008. (Tr. 629-632).  Dr. McKeever opined that Huron suffers from lumbar disc degeneration and spondylosis. He checked boxes identifying Huron's symptoms that supported this diagnosis: abnormal gait, sensory loss, reflex changes, reduced motion on extension, a positive straight leg raising test, abnormal gait, tenderness, muscle spasm, muscle weakness and impaired sleep. Dr. McKever characterized Huron's prognosis as "poor-guarded." Based on this diagnosis, Dr. McKever opined that Huron could sit for not more than one and a half hours, stand no more than

two hours, sit and stand for no more than four hours, walk no more than an hour with five minute breaks, and climb stairs, but could rarely twist, stoop, crouch, squat, or climb ladders. Dr. McKeever responded to the ALJ's decision in a letter dated September 10, 2010. (Tr. 627). While Dr. McKeever expressed agreement with many parts of the ALJ's decision, he disputed the vocational expert's conclusion that Huron could perform work as a construction labor supervisor, a construction labor expediter, and as a hardware sales clerk. He opined that Huron could not perform any these occupations. (Tr. 627).

Huron has also been diagnosed with and treated for prostate related problems at the VA. The medical records reveal that Huron has a history of elevated PSA levels but biopsies of the prostate were benign in 2000, 2002, 2007, and 2008. (Tr. 285, 286, 287, 288, 292, 293, 308, 309, 310, 311, 312, 313, 323, 324, 328).

In addition, the medical record reveals Huron complained of and was treated at the VA for hearing loss. He had ear wax removed in 2007 (Tr. 300, 301). He was referred for an audiology consult in July 2007. He was prescribed hearing aids on August 7, 2007 but failed to have the hearing aids fitted. (Tr. 301-305).

Huron has also been treated for skin problems including acne, rashes and fungal infections. (Tr. 290, 291, 354, 355, 356, 357). In 2009, Huron complained of coughing and passing out. He was referred for a sleep study, CT of his head, ECG, carotid doppler, and echocardiogram. The results of all the tests were normal. (Tr. 325-329).

Huron's prescriptions have been filled though the VA. His list of medications as of October 8, 2009, include amlodipine (heart/blood pressure), artificial tears as needed, skin cleanser, clotrimazole (topical cream for fungal infection between toes), cough medicine, loratadine

14

(allergies), menthol (skin cream), miconazole (topical cream for fungal infection between toes), nicotine gum, omeprazole (stomach), simvastatin (cholesterol), trazodone (sleep, if necessary), and triamcinolone (skin). (Tr. 325, 326).

Huron has been treated intermittently for mental health issues at the VA. Most of the treatment records are from 2003-2004, when he was drinking heavily. The mental health records reflect alcohol problems as his primary diagnosis and PTSD as his secondary diagnosis.  Huron denied being depressed at his August 4, 2004, treatment session. He expressed being angry about his ongoing financial problems and dealing with worker's compensation.  (Tr. 503-507, 509-511, 511-512, 516-518, 520-521, 521-523, 524-525, 525-530).  531-539, 525-530, 524-525, 521-523, 516-518).  A nurse note dated February 6, 2007, showed that Huron's depression pre-screen test was positive but he refused further work up for depression. (Tr. 482).   Huron has been prescribed medication for insomnia that he takes as needed. He has no treating relationship with any mental health professional at the VA. Likewise, no medications for PTSD or depression have been prescribed.

In 2009, Huron sought to increase his disability rating at the VA.  He was evaluated in connection with his request. Based on the evaluation, Huron was awarded an individual unemployability rating of 50% due to PTSD with an effective date of May 27, 2009.  The letter advising Huron of the increase in his unemployability rating states in pertinent part that a "mental health examiner has indicated that your post traumatic stress disorder symptoms cause employment difficulties" and that Huron would "likely have difficulty maintaining employment due to your symptoms of Post traumatic stress disorder." (Tr. 617). The examiner noted Huron had some memory and concentration difficulties and problems with interpersonal and occupational

15

functioning.  He had a GAF score of 50.[4]

Huron testified about his health and its impact on his daily activities.  Huron was sixty-three years old at the time of the hearing on July 16, 2010. He stated that he lives with his wife and his grandson, age 17. His grandson has lived with the couple since he was age seven. (Tr. 51-52). Huron testified he had worked construction jobs but on an infrequent basis.

With respect to his back, Huron testified he injured his back in 1997. Huron recounted the types of treatments he received for his back: physical therapy, going to a chiropractor and steroid injections.  (Tr. 58, 65-69).   Huron stated  that surgery was discussed but not scheduled. He expressed a desire to have back surgery. (Tr. 90, 95).   Huron also testified that he has problems with high blood pressure, hearing loss, anxiety attacks and insomnia. (Tr. 76-79).   According to Huron, "I have some problems." (Tr. 79). Huron denied seeing a psychiatrist, psychologist or any kind of mental health counselor. (*Id.*). Huron testified that he underwent a mental health evaluation at the VA in 2009, and had seen someone approximately ten years ago. (Tr. 80).

With respect to his functional abilities, Huron estimated he could sit for a couple of hours. stand for an hour or an hour and a half, and walk about a mile.  (Tr. 81, 82). Huron testified he avoids lifting but estimated he could probably lift twenty to thirty pounds. (Tr. 81). With respect to daily activities, he eats breakfast, watches CNN, walks around his neighborhood, attends church, occasionally goes to the grocery store with his wife, spends time with his grandson, eats out, and travels outside of Houston to visit friends and family. (Tr. 85, 86, 89, 90). He denied having hobbies

---

[4] The Global Assessment Functioning (GAF) score rates the social, occupational, and psychological functioning and is given as a range. A score of 41-50 suggests serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

or any interests. (Tr. 86). Huron complained that the pain is driving him crazy. (Tr. 86). He expressed a desire to have back surgery. (Tr. 90, 95).

Here, substantial evidence supports the ALJ's finding that Huron's disorders of the back (discogenic and degenerative), depression, and post traumatic stress disorder were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment and that he had the RFC to perform light work. The ALJ found that Huron could occasionally lift 20 pounds and frequently lift 10 pounds. He could sit, stand, and walk six of eight hours each for a full eight-hour day. He was unlimited in being able to push/pull and had gross/fine dexterity. He could occasionally climb stairs and ladders. He could bend, stoop, crouch, crawl, balance, twist and squat. He could get along with others, understand detailed instructions, concentrate and perform detailed tasks and respond and adapt to workplace changes and supervision. Substantial evidence supports the ALJ's finding that Huron could  perform light work limited to the extent that he could not climb ladders, ropes or scaffolds or run.  The determination of a claimant's RFC is the sole responsibility of the ALJ. *See Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). Here, the ALJ properly interpreted the medical evidence to determine Huron's RFC and gave specific reasons in support of his RFC determination.  Upon this record, substantial evidence supports the ALJ's RFC assessment.

In addition, substantial evidence supports the ALJ's finding that Huron's bilateral hearing loss and an elevated prostate specific antigen ("PSA") level and an enlarged prostate were not severe impairments. While the records indicate that Huron had hearing loss, the records likewise show that Huron did not keep appointments for the fitting of hearing aids, and that he appeared at the hearing without hearing aids and responded to questions posed to him by the ALJ, and that his hearing loss

was not a severe impairment.  Likewise, the records show that Huron had an elevated PSA level but none of his biopsies showed cancer or that he needed further treatment relating to his prostate and that his prostate issues were not a severe impairment.  This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with  . . .  other substantial evidence.'"  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'"  *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status."  *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20

C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d). *Newton,* 209 F.2d at 456. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

Huron contends that the ALJ committed three errors. First, Huron argues that the ALJ failed to consider all the evidence. According to Huron, the ALJ failed to correctly evaluate the opinion of Dr. Brownhill. Huron argues that because the ALJ's decision does not quote the entire report as it pertains to Huron treatment for ten years, that the ALJ did not consider his report. The Commissioner counters that simply because the ALJ did not discuss Huron's ten year treatment history as detailed in Dr. Brownhill's report, it does not follow that the ALJ did not consider his report. The law is clear that an ALJ is not required to reference everything in the record, and the failure to discuss each piece of evidence does not mean that it was not considered. The ALJ is obligated to specify the evidence considered that supports his decision and also set forth why other evidence was rejected. Huron has not shown that the ten year treatment history was uncontroverted

20

evidence that the ALJ chose either not to rely on or significantly probative evidence that the ALJ

rejected. Here, the ALJ mentioned not only Dr. Brownhill's report but also that of Dr. Rodriguez,

who also described Huron's back problems since 1997.

Next, Huron argues that the ALJ misstated the medical evidence and rendered his own

medical opinion when he wrote in pertinent part: "a MRI of the claimant's lumbar spine performed

on July 6, 2008, showed multilevel degenerative changes with marked facet arthrosis in the lumbar

spine at the L3 to S1 levels but no significant abnormalities were identified." (Tr. 30). The

radiologist, Dr. Joseph Nguyen, wrote:

> Findings: The lumbar spine alignment is normal. The bone marrow signal is
> unremarkable and there is no bony lesion. The visualized paravertebral soft tissues
> are within normal limits. The visualized lower lumbar spinal cord, conus, and cauda
> equina are unremarkable.
>
> There are multilevel degenerative changes in the lumbar spinal vertebrae and discs
> consistent of posterior disc bulges, anterior osteophyte formation, facet joint
> hypertrophy and ligamentous hypertrophy. These changes are causing varying
> degrees of lumbar spinal canal stenosis and foraminal narrowing as described below.
>
> L3/L4 Level: Diffuse disc bulge and marked facet arthropathy. Mild spinal stenosis.
> No foraminal stenosis.
>
> L4/L5 Level: Diffuse disc bulge and marked facet arthropathy. Moderate to severe
> spinal stenosis. The right lateral recess is narrowed. The left appears patent. No
> foraminal stenosis
>
> L5/S1 Level: Diffuse disc bulge and marked facet arthropathy. No spinal stenosis.
> Moderate bilateral foraminal stenosis.
>
> Remaining lumbar spine levels are unremarkable.
>
> Impression: Multilevel degenerative changes and marked facet arthrosis in the lumbar
> spine from L3 to S1 but worse at L4-5 level. (Tr. 288).

Huron takes issue with the ALJ's omission that his lumbar spine was worse at the L4-5 level, and

argues that the ALJ was downplaying the severity of his condition by omitting that it was worse at L4-5. Huron has not shown that the ALJ's finding that the MRI showed marked facet arthrosis from L3-S1 was incorrect since L3-S1 includes L4-5.

To the extent that Huron relies on opinions of Dr. Francis, a one time examining physician, and his treating physician, Dr. McKeever, who both opined he was disabled, an opinion by a physician that a claimant is disabled is not binding on the ALJ.  It is the province of the ALJ to make a determination of a claimant's disability and any opinions made by a physician, treating or non-treating, are not binding on the ALJ. See *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (physician opinions that an applicant is "disabled" or "unable to work" have no special significance). As for Dr. McKeever's opinion, even though he identified himself as Huron's treating physician, there were no medical records that corroborated his opinion. He checked boxes indicating the symptoms that Huron had. Based on Huron's symptoms, and his clinical finding that he had a reduced range of motion in his spine, Dr. McKeever opined about Huron's functional abilities. Given the conclusional nature of the Assessment, and the absence of any treating records supporting his findings, the ALJ was not required to give controlling weight to Dr. McKeever's Assessment.

Finally, Huron argues that the ALJ failed to consider the VA determination of September 16, 2009 of unemployability of 50% due to PTSD. The law is clear that a VA disability determination, while entitled to weight and consideration, is not binding on the ALJ. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *See also* 20 C.F.R. §§ 404.1504, 416.904. Here, the ALJ fulfilled his obligation to consider and give weight to the VA's July unemployability rating of 50% due to PTSD. Moreover, to the extent the VA evaluator opined that Huron's PTSD could cause employment difficulties, such statements are vocational opinions and as discussed above are

22

the province of the Commissioner.

With respect to the ALJ's consideration of the opinion evidence, including the VA determination, he wrote:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-6p, and 06-3p.
>
> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.
>
> The claimant testified that he lives with his wife and that they have been raising their grandson, who is 17 years old, since he was age 7. He alleges disability since the year 2003 but testified that he has been doing self-employed contractor work since that time through the year 2009. The claimant stated that he receives income of $2,828.00, from veteran's benefits and $948.00 from Social Security Retirement benefits. He also stated that he received approximately $5,000.00 total in the year 2009 from his self-employed work activity.
>
> The claimant alleges disability due to his back, which was injured in 1997 but that he never had any surgical procedures. He indicated that he has undergone physical therapy, chiropractor treatment, and has had about four injections since the initial injury. The claimant also indicated that he has mental problems to include depression and anxiety attacks. In his activities of daily living, the claimant testified that he can sit a couple of hours, lift up to 30 pounds, walk about a mile, and stand about 1 and ½ hours. He indicated that he drives an automobile, grocery shops, attends church

services, spends time with his grandson, and takes trips to visit relatives.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Despite the claimant's allegations, there is no objective medical evidence of record to support disability in this case. While the claimant does have some back pain, the overall objective medical evidence of record demonstrates that he has had no significant limitations as a result. There is no objective medical evidence of record that the claimant has any gait disturbance or significant neurological deficits. In fact, the claimant's treating physician reported that the claimant was able to return to work without restrictions on August 17, 2004 (Exhibit 9F, page 3). Even though the claimant has some mental problems, there is not objective medical evidence of record that such problems significantly interfere with his ability to work. There is no objective evidence that the claimant has been hospitalized for mental problems or that he has had any ongoing treatment from a mental health professional. (Exhibit 3F, page 131).

The undersigned also recognizes that while the claimant has some limitations secondary to his medical problems, he has not been compliant with treatment and has a history of alcohol abuse and dependence, which has had a negative impact on his medical problems (Exhibit 3F, pages 64, 66 and 110). However, the evidence establishes that the claimant stopped and or decreased his consumption of alcohol in May 2009 (Exhibit 3F, page 131). The undersigned further recognizes that even though the claimant alleges being totally disabled, he has engaged in work activity since the year 2003, demonstrating that he is able to engage in work activity at least at the light level.

Furthermore, the claimant's activities of daily living are also consistent with a light level of work activity. He drives an automobile, grocery shops, spends time with his grandson, and takes multiple trips to visit relatives and go to festivals. These activities reveal a significantly greater physical and mental functional ability than alleged. The claimant is receiving income from multiple sources to include $2,828.00 in veteran's benefits and $948.00 from Social Security Retirement benefits, totaling $3,776.00 a month, that supports a conclusion that he lacks a motivation to work.

While the claimant may have some pain, factors for consideration in evaluating an individual's subjective complaints of pain include whether there is documentation of persistent significant limitations of range of motion, muscle spasm, muscular atrophy from lack of use, significant neurological deficits, weight loss or impairment

of general nutrition, and non-alleviation of symptoms by medications. *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987); *Hames v. Heckler*, 707 F. 2d 162, 166 (5th Cir. 1983). None of the claimant's examinations disclosed the above findings to any significant degree.

The claimant's main subjective symptoms or complaints, including pain, have been addressed. All other subjective complaints have also been carefully considered but are found to be only minor and not supported by linkage in the severity of any medically determinable impairment reasonably expected to produce such alleged incapacitating symptoms. *See* 20 C.F.R. 404.1529 and 416.929; *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). Accordingly, the claimant's subjective allegations are not wholly credible and only partially supported by the overall medical evidence of record.

As for the opinion evidence, the undersigned recognizes that the claimant has been given disability ratings on some of his impairments from the Veteran's Administration for which he receives payments. However, the criteria for establishing disability under the Social Security Regulations are different and require different standards be met to establish disability, none of which have been met in this case. Furthermore, there is little evidence of any significant, consistent, medical treatment from 2001 through 2009, except chiropractic care. (Exhibit 3F).

Thus, the undersigned disagrees with the opinions of the Veteran's Administrative that any of his impairments, singly or in combination, disables him from all work activity. The undersigned has also considered the State agency medical consultants physical assessments and State agency psychologists mental assessments and, gives some weight to these opinions insofar as they support my established residual functional capacity above. However, new and material evidence has been received at the hearing level that was not considered nor does it appear that the claimant's subjective allegations were adequately considered. The undersigned has also considered the opinion of Dr. Thomas M. Hallisey, a chiropractor, who opined, in an undated document, that he does not feel that the claimant will ever improve to go back to work in a normal work force (Exhibit 9F, page 6). The undersigned gives little weight to this undated, medically unsupported opinion from a non-qualified medical source, a chiropractor, and finds it is inconsistent with the overall objective medical evidence of record. Furthermore, the opinion of Dr. Hallisey is grossly inconsistent on its face with the claimant's rather extensive work and other daily activities articulated throughout the medical record and in hearing testimony by the claimant himself. For example, the performance of self-employed contracting work since the time of his alleged onset date of disability, per the claimant's own testimony.

Considering the claimant's history and treatment, the objective clinical findings, the

claimant's statements and testimony regarding his symptoms and functional limitations, the observations and comments of his treating sources, the assessment of the State Agency reviewing physician(s), and all of the evidence of record considered as a whole, it is concluded that the claimant has the residual functional capacity as determined in the body of this decision. (Tr. 32-35).

Here, the ALJ evaluated the physician opinions under the framework under § 404.1527(d). The undersigned Magistrate Judge finds that the ALJ's decision is a fair summary and characterization of the medical records. The ALJ thoroughly discussed the medical evidence and gave specific, detailed reasons for the weight given. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir.

1994).   The Act requires this Court's findings to be deferential.   The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Huron testified that he last worked in December 2009, and even then, he did no physical labor. Rather, he supervised others do the type of work that he used to be able to do: sheet rock work. (Tr. 54-56).

Huron also described the type of treatment he received for his back injury since 1997.  (Tr. 65, 66, 67, 68, 69, 72).  Huron denied knowing he had been released back to work. (Tr. 73-74).  With respect to his anxiety attacks and insomnia, Huron stated that he had "some problems" but was not seeing a psychiatrist, psychologist or mental health counselor. (Tr. 79).

Huron estimated that he could lift no more than 20 or 30 pounds, could walk a mile, and stand for an hour. (Tr. 81, 82). Huron's daily activities include eating breakfast, and watching television. (Tr. 85). He stated he is able to drive. (*Id.*). Huron denied having any hobbies or interests. (Tr. 86). He added he sometimes goes to the grocery store with his wife. (Tr. 88). He also testified that he goes to Church and spends time with his grandson.  (Tr. 89). Huron further stated he has gone to Kerrville and San Antonio. (Tr. 90).

Based on the reasons which follow, the ALJ rejected Huron's testimony as not fully credible:

The undersigned also recognizes that while the claimant has some limitations secondary to his medical problems, he has not been compliant with treatment and has a history of alcohol abuse and dependence, which has had a negative impact on his medical problems (Exhibit 3F, pages 64, 66 and 110). However, the evidence establishes that the claimant stopped and or decreased his consumption of alcohol in May 2009 (Exhibit 3F, page 131). The undersigned further recognizes that even though the claimant alleges being totally disabled, he has engaged in work activity since the year 2003, demonstrating that he is able to engage in work activity at least at the light level.

Furthermore, the claimant's activities of daily living are also consistent with a light level of work activity. He drives an automobile, grocery shops, spends time with his grandson, and takes multiple trips to visit relatives and goes to festivals. These activities reveal a significantly greater physical and mental functional ability than alleged. The claimant is receiving income from multiple sources to include $2,828.00 in veteran's benefits and $948.00 from Social Security Retirement benefits, totaling $3,776.00 a month, that supports a conclusion that he lacks a motivation to work.

While the claimant may have some pain, factors for consideration in evaluating an individual's subjective complaints of pain include whether there is documentation of persistent significant limitations of range of motion, muscle spasm, muscular atrophy from lack of use, significant neurological deficits, weight loss or impairment of general nutrition, and non-alleviation of symptoms by medications. *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987); *Hames v. Heckler*, 707 F. 2d 162, 166 (5th Cir. 1983). None of the claimant's examinations disclosed the above findings to any significant degree.

The claimant's main subjective symptoms or complaints, including pain, have been addressed. All other subjective complaints have also been carefully considered but are found to be only minor and not supported by linkage in the severity of any medically determinable impairment reasonably expected to produce such alleged incapacitating symptoms. *See* 20 C.F.R. 404.1529 and 416.929; *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). Accordingly, the claimant's subjective allegations are not wholly credible and only partially supported by the overall medical evidence of record. (Tr. 34).

Huron contends that the ALJ's credibility assessment is not supported by substantial evidence. The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ found Huron not credible regarding his daily activities. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but

28

cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Wallace Stanfill, a vocational expert ("VE"), at the hearing."A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling,* 36 F.3d at  436.

The ALJ posed the following hypothetical questions to the VE:

Q. All righty. Here, we've got, during the relevant period we've got an individual of advanced age and also an individual of retirement age. He has ... that'd be two years of college; an exertional ability to occasionally lift 20 pounds, 10 pounds frequently; sit, stand, walking ability six of eight; his push/pull and gross/fine is unlimited. I'll say occasional stairs, but no ladders, ropes, scaffolds or running. He can bend, stoop, crouch, crawl, balance, twist and squat. He has the ability to get along with others. Can understand detailed instructions, concentrate and perform detailed tasks and respond and adapt to workplace changes and supervision. Now, based on that, could he do any of the past work?

A. The job of contractor, Judge, would physically fit into this hypothetical. However, it does involve more complex aspects than your detailed hypothetical. So that would preclude the past relevant work.

Q.  Okay. Any transferable?

A.  Yes, Sir.

Q.  What kind are we looking at here?

A.  Skillful use of hand tools, materials and methods used in construction; read, understand and follow blueprints, schematics, similar drawings; working on objects with great preciseness; and supervising and directing the work of others.

Q.  And what kind of jobs would be available for those kinds of skills?

A.  These would transfer to jobs such as a construction labor supervisor, found in the DOT, Judge, at 860.137-010. In terms of the numbers of occurrences, Judge, if we look at the, the five-county Houston area, there are approximately 950 of these jobs locally, 190,000 in the national economy. Another job would be a, a construction laborer expediter, DOT number 249.137-018, with 650 of these jobs locally, 150,000 in the national economy, or hardware sales, DOT number 279.357-050, with 1,400 jobs in the Houston region, 250,000 in the national economy.

Q.  Okay. Now, what was the title on that last one?

A.  Hardware sales clerk. (Tr. 93-95).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Huron was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Huron could perform work as a construction labor supervisor, a constructor labor expediter, and as a hardware sales clerk because the above described jobs are consistent with his RFC.  The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Huron was not disabled within the meaning of the Act and

therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Huron was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. Moreover, given that the Commissioner's decision is affirmed, Huron's request for a different ALJ on remand is moot.  As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 10), is DENIED, Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 31st day of August, 2013

_____

Frances H. Stacy
United States Magistrate Judge